UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

| | |
|---|---|
| **MIDWEST AGENCY SERVICES, INC.,**<br>2508 Civic Center Drive, Suite B<br>Cincinnati, Ohio 45231, | Case No.<br><br>JUDGE |
| Plaintiff, | **PLAINTIFF'S COMPLAINT WITH JURY DEMAND** |
| v. | |
| **JP MORGAN CHASE BANK, N.A.,**<br>270 Park Avenue, Floor 48<br>New York, New York 10017 | |
| SERVE:<br>Mr. James L. Dimon<br>270 Park Avenue, Floor 48<br>New York, New York 10017-2014 | |
| And | |
| **CHASE AUTO FINANCE CORP.,**<br>900 Stewart Avenue<br>Garden City, New York 11530., | |
| SERVE:<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801, | |
| And | |
| **CHASE INSURANCE AGENCY, INC.,**<br>111 East Wisconsin Avenue WI1-1100,<br>Milwaukee, Wisconsin 53202, | |

|  |  |
|---|---|
| **SERVE:** | : |
| **Jim L. Harlin** | : |
| **111 East Wisconsin Avenue,** | : |
| **Suite 1100** | : |
| **Milwaukee, Wisconsin 53202,** | : |
| **Defendants.** | : |

**NOW COMES** Midwest Agency Services, Inc., by and through counsel, and for its Complaint against Defendants JP Morgan Chase Bank, N.A., Chase Auto Finance Corp., and Chase Insurance Agency, Inc., states as follows:

### Nature of the Action

1.  Defendants caused antitrust and other damages to Plaintiff by flexing their substantial market power in the midwest vehicle finance market to improperly promote their gap insurance products in markets where they do not enjoy substantial strength through improper tying arrangements in violation of state and federal and state law.

### Jurisdiction and Venue

2.  This Court has subject matter jurisdiction over Counts I and II of this Complaint pursuant to 28 U.S. Code §1331 and §1332.

3.  This Court has supplemental jurisdiction pursuant to 18 U.S. Code §1367 over the remaining claims in this Complaint.

4.  All parties are subject to the personal jurisdiction of this Court.

5.  Venue is appropriate in the Eastern District of Kentucky pursuant to 28 U.S. Code §1391 because the events giving rise to the claims pled occurred in this District and the Defendants are subject to personal jurisdiction in this District.

**Parties**

6.     Midwest Agency Services, Inc. ("Midwest") is incorporated in Ohio and has its principal place of business in Cincinnati, Ohio.  Midwest is engaged in business and registered to do business in Kentucky.

7.     Defendant JP Morgan Chase Bank, N.A. ("Chase") is a national bank with its principal place of business at 270 Park Avenue, New York, New York 10017.  Chase is a bank within the meaning set forth in the Bank Holding Company Act, Title 12, U.S. Code, §1971 *et seq*.  Chase is one of the largest banking institutions in the United States, with thousands of branches.  Chase is a wholly-owned subsidiary of JP Morgan Chase & Co. ("JP Morgan"), one of the world's largest financial service firms, having $2.2 trillion in assets, more than 200,000 employees, $166.9 billion in stockholders' equity, operations in more than 60 countries, and millions of customers in the United States.

8.     Chase Auto Finance Corp. ("CAF") is a Delaware corporation with its principal place of business at 900 Stewart Avenue, Garden City, New York 11530.  CAF is a wholly-owned subsidiary of Chase.  CAF operates 47 offices and satellite locations and purchase retail installment contracts across the continental United States, Hawaii, and Alaska.  CAF's Dealer Commercial Services division is the largest non-captive floor plan and commercial loan provider for auto dealerships across the nation.  Between January and June of 2009, CAF and Chase had the largest market share of the retail auto finance market.

9.     Chase Insurance Agency, Inc. ("CIA") is a Wisconsin corporation with its principal place of business at 111 East Wisconsin Avenue WI1-1100, Milwaukee, Wisconsin 53202.  Chase Insurance Agency, Inc. is a wholly-owned subsidiary J.P. Morgan Insurance Holdings, LLC, which in turn, is a wholly-owned subsidiary of JP Morgan.

**Factual Background**

10. The majority of car buyers don't have cash to pay the dealer for the vehicle of their choice. These buyers have three major options. First, the buyer can personally borrow the money from a third party, e.g. a bank, a credit union, or an uncle. Second, a financing company affiliated with the manufacturer of the purchased vehicle, e.g., Ford Motor Credit Company, may agree to lend the buyer the money. Third, the purchase is funded through "indirect auto lending." This third option is the focus of this case.

11. In an indirect auto lending transaction, the dealer sells the vehicle on credit ("the Credit Transaction"). On its face, the dealer is the creditor in the transaction; the car buyer is the debtor. The dealer typically enters this role as creditor only because it has the expectation that it will be able to transfer its rights and obligations under the Credit Transaction to another entity. The dealer does this for a profit, depending on the difference in the interest rates in the first transaction between the car buyer and dealer and the second transaction between the dealer and the secondary finance institution.

12. Chase is the largest institution that acquires these Credit Transactions from vehicle dealers, typically before the car buyer's signature is dry. These purchases are referred to as "indirect auto lending." Indirect auto lending is a specialized subdivision of the commercial lending industry. Chase acquires these Credit Transactions individually and indirectly through its agent and subsidiary CAF. CAF's involvement in this transaction is simply a reflection of Chase's model for serving consumers through what it calls "multiple channels." Defendants make these acquisitions at more than 16,000 dealerships across 23 states. In 2008, Chase reported that it held $42.6 billion in consumer automobile loans.

13.     Chase and CAF are aware that dealers would soon be unable to operate their business if they were unable to unload the commercial paper generated by their car sales operations. Companies like Chase and CAF which are engaged in the business of purchasing Credit Transactions make dealers aware of the terms on which they are willing to do business. Chase and CAF market these purchases as a product. Because of their substantial market power, Chase and CAF do not have to, and do not, negotiate with dealers over the terms on which they will purchase Credit Transactions.

14.     In any vehicle sale, the dealer will offer to sell the buyer ancillary products and services. One such ancillary service is gap insurance.

15.     Gap insurance is an insurance product that may protect the car buyer against certain risks in the event of loss. If the vehicle is "totaled" in an accident, for example, the buyer's primary insurance carrier will typically pay only the market value of the vehicle at the time of loss. This market value may be less than the balance the buyer owes under the Credit Transaction. Gap insurance protects the buyer against that risk by providing coverage for the difference, i.e., the gap, between the recovered market value and the balance on the Credit Transaction.

16.     Scores of gap insurance products are available in the Kentucky vehicle market. Vehicle buyers typically do not discriminate between available gap insurance products. Instead, the car buyer's involvement is generally limited to a buy or not-to-buy decision. If the decision is to buy gap insurance, the product purchased is typically the product proffered by the dealer at the point of sale.

17.     When a vehicle buyer purchases gap insurance, the cost of that product is typically included in the total amount financed by the dealer.

18. Midwest is engaged in the business of providing various products and services to its customers. Midwest's customers include more than 300 motor vehicle dealers in Kentucky, Ohio, Indiana, Tennessee and West Virginia (collectively, the "Territory") and, indirectly, their customers. Midwest's products include a gap insurance product called "Premier Gap."

19. CIA sells two gap insurance products, including a product called One Gap. CIA's gap insurance products compete with the gap insurance product offered by Midwest. CIA does not dominate the gap insurance market. On information and belief, CIA has less than a ten percent market share of the gap insurance market in the Territory.

20. On or after June 1, 2009, Chase and/or CAF announced to dealers what Defendants called an internal policy changes regarding the transactions they were willing to acquire.

21. On information and belief, CAF made Kentucky dealers aware that CAF would not purchase Credit Transactions that included gap insurance products unless the product was one of a handful of products on a CAF's approved list (the "Approved List"). Midwest's products were not on the Defendants' Approved List. The gap insurance products of CIA, however, were on the Approved List.

22. The gap insurance products of Midwest are superior to those of CIA in every commercial respect. Significantly, Midwest's gap insurance product is backed by an insurance company with a stronger rating than that enjoyed by the insurance carrier backing CIA's gap insurance product. Defendants have "approved" the same Midwest products in every state other than Kentucky. Defendants readily purchase Credit Transactions from dealers in states outside Kentucky notwithstanding that the Credit Transaction includes the financing of Midwest's gap insurance product.

23. On information and belief, the criteria used by Defendants to determine which gap insurance products would be on the Approved List have nothing to do with the reliability of the product, the strength of the company backing the product, or any other factor affecting any risk undertaken by Chase and/or CAF.

24. On the contrary, Defendants' Approved List is a subterfuge used by CAF to funnel business to CIA, their affiliate. Chase and CAF use the Approved List as a tool to coerce dealers into purchasing CIA's gap insurance products. Chase and CAF use the Approved List as a tool to coerce dealers into refraining from offering to car buyers the Midwest gap product and the gap insurance products of dozens of other companies excluded from the Approved List.

25. Defendants have rejected Credit Transactions that contained Midwest's gap insurance product, returned the paperwork to the dealer, and verbally suggested the dealer substitute the gap insurance product sold by CIA. Once the dealer substituted the CIA insurance product, Defendants purchased the Credit Transaction from the dealer.

26. On information and belief, Defendants intend to carry this Approved List tying concept to other states, including the states in the Territory. As such, the damages incurred by Midwest continue to mount and threaten to increase exponentially.

27. Midwest has incurred damages as a direct result of Defendants' efforts to unreasonably restrain competition in the gap insurance industry. Those damages include lost sales of its gap insurance products. In addition, Midwest has suffered from loss of sales of its other products, including without limitation etch protection products, vehicle service contracts, tire and wheel protection products, and credit life disability insurance products. Dealers have a disincentive to do business with Midwest because they have reached the erroneous conclusion that Midwest's products were excluded from the Approved List on quality grounds. Likewise, Defendants'

conduct has proximately caused Midwest damage because dealers are erroneously led to believe that these other products will likewise prevent the sale of the Credit Transactions to Defendants.

## Count I
## Unreasonable Restraint of Trade under the Sherman Act

28.     Midwest incorporates every allegation in each of the preceding paragraphs as if fully rewritten.

29.     Tying exists where a seller conditions the sale of one good (the tying product) on the buyer also purchasing another, separate good (the tied product).  The antitrust concern over tying arrangements arises when the seller can exploit its market power in the tying market to force buyers to purchase the tied product which they otherwise would not, thereby resulting in substantial foreclosure of competition in the other weaker product market.

30.     Reciprocal dealing exists where one party offers to buy the other party's goods, but only if the second party buys other goods from the first party, i.e., when when one party tells the other: "I'll buy from you, if you buy from me."  Reciprocal dealing is improper when it is coercive.  Reciprocal dealing is coercive when the parties are not on equal footing.  Here, Plaintiff and the dealers are not on equal footing with respect to the vast purchasing power wielded by Defendants.

31.     Illegal exclusive dealing results when a contract is conditioned upon the agreement of one party to refrain from dealing with another party.

32.     In this case, the products and/or services are distinct and separate: the tying product is the purchase of Credit Transactions; the tied product is CIA's gap insurance.

33.     Other companies also purchase Credit Transactions from dealers.  Unlike Chase and CAF, some of these other companies are "captives," i.e., affiliates of vehicle manufacturers.  The

products of Chase and CAF are not reasonably interchangeable with the products offered by captives. The products of Chase and CAF are reasonably interchangeable with the products offered by other non-captive indirect auto lenders because of the comparable pricing, benefits, and use of those products. Chase and CAF are the biggest players in the non-captive indirect auto lending product market.

34. The product market for CIA gap insurance is the gap insurance market. Gap insurance is offered by scores of companies. Gap insurance products offered by other companies in the market are reasonably interchangeable with CIA gap insurance and offer similar benefits and pricing schemes. Midwest's gap insurance products are superior to CIA gap insurance and other gap insurance products in many respects but are, nevertheless, reasonably interchangeable with those gap insurance products.

35. The geographic market for indirect auto financing products, i.e., the area where Kentucky dealers would look for persons willing to acquire their Credit Transactions, is limited to banks doing business within Kentucky. Indirect auto financing requires a working knowledge of the local economy, the specific dealership involved, and that dealership's customers. Banks typically offer these services through sales representatives, operating out of local offices, limited to areas within their banking, "footprint", i.e. where their branches and offices are located. Chase and CAF are one of the most powerful indirect auto lenders not only on a national stage, but also in Kentucky and its neighboring states.

36. The geographic market for gap insurance, i.e., the area where Kentucky dealers and their customers would look for gap insurance options, is the entire United States. Gap insurance is marketed across state borders with ease.

37. Defendant Chase and Defendant CAF had appreciable economic power in the Credit

9

Transaction product market, i.e., the indirect auto financing market. CAF together with Chase is the largest provider of indirect auto financing in the country. The market power of Chase and CAF is such that these Defendants have the ability to raise prices or to require purchasers to accept burdensome terms that can not be exacted in a completely competitive market. This power is reflected in Defendants share of the market for Credit Transactions. Defendants Chase and CAF have sufficient economic power in the market for the tying product to distort dealers' choices with respect to the tied product.

38. The market power of Chase and CAF is also evident from the fact that the tie was accepted by an appreciable number of buyers within the market, and that there is an absence of other explanations for their willingness to kowtow to Defendants conditions.

39. All Defendants have an economic interest, directly or indirectly, in the tied product, i.e., CIA's gap insurance.

40. At all pertinent times, an agreement, express or implied, existed between and among Defendants to establish and maintain the improper tying arrangement described herein. Defendants' concerted actions constitute a horizontal restriction on trade, i.e., tying two unrelated products or services together. Defendants use their awesome market power in financing, to restrict competition in another, unrelated industry, here gap insurance.

41. At all pertinent times, Defendants maintained a conscious commitment to a common scheme designed to achieve an unlawful objective of anti-competitive tying for their common financial gain. Defendants harbored the specific intent to restrain competition in concocting and implementing the tying scheme described herein. Defendants harbored the specific intent to induce dealers to refrain from using competitors' gap insurance products, including those offered by Midwest, and penalized them for doing so by rejecting the dealers' tender of Credit

Transactions involving those gap insurance products.

42. The tie foreclosed a substantial amount of commerce in the market for the tied product, i.e., the gap insurance market.

43. Defendant's scheme constitutes tying, illegal exclusive dealing, reciprocal dealing and other unreasonable restraints of trade in the gap insurance market in violation of 15 U.S. Code §1. Every dealer and customer who desires to place its financing with Chase and/or CAF is precluded from selecting any alternate gap insurance not on Defendants' Approved List, including Midwest's gap insurance product and the gap insurance products of dozens of other companies.

44. The only rational motivation for the Tying Agreement is to use the market power of Chase and CAF—and the power of their brand—in the automotive finance market to increase sales of their separate products in the gap insurance market.

45. The Tying Agreement naturally forecloses competition in the entire gap insurance industry. As a matter of practical economics, Defendants actions have had a substantial adverse effect on the interstate commerce involved. In addition to Midwest, every other provider of alternate gap insurance is prohibited under the Tying Agreement.

46. CAF is not entitled to meddle with the dealers' proffer of, or the buyer's decision regarding, gap insurance products because gap insurance is not intended to protect CAF's risk. This is evident from the fact that Defendants will acquire Credit Transactions which contain no gap insurance product.

47. Defendants' improper tying arrangement has no pro-competitive effects.

48. As a proximate result of Defendants' actions described above, Midwest has suffered an antitrust injury and substantial damages in excess of the jurisdictional threshold of this Court, to

be proven at trials. Midwest's injury was a consequence of the diminished competition proximately caused by Defendants' scheme.

49. Per 15 U.S. Code §15, Midwest is entitled to recover three times its damages and costs, including attorney's fees, of pursuing this action.

## Count II
## Illegal Tying under the Bank Holding Company Act

50. Midwest incorporates every allegation in each of the preceding paragraphs as if fully rewritten.

51. The purpose of Bank Holding Company Act, 12 U.S.C.A. §§ 1971 *et seq.*, is to prohibit anticompetitive practices which require bank customers to accept or provide some other product or refrain from dealing with other parties in order to obtain the bank product or services they desire.

52. Section 1972 of the Bank Holding Company Act states in relevant part:

> (1) A bank shall not in any manner extend credit . . . nor furnish any service on the condition or requirement—
>
> > (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit or trust service;
> >
> > (B) that the customer shall obtain some additional credit, property or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;
> >
> > (C) that the customer provide some additional credit, property or service to such bank other than those related to and usually provided in connection with a loan, discount deposit or trust service;
> >
> > (D) that the customer provide some additional credit, property or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; or
> >
> > (E) that the customer shall not obtain some other credit, property or service from a competitor of such bank, a bank holding company of such

bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

53. Defendant Chase is a national bank. Defendants CAF is a bank, agent of a bank, or operating subsidiaries and/or financial subsidiaries of one or more of the foregoing entities. Chase, CAF and CIA are affiliates of one another and direct or indirect subsidiaries of JP Morgan. Defendants, directly or through corporate parents and/or affiliates, offer banking products and services including, but not limited to, online banking, demand deposits, money market accounts, checking accounts, saving accounts, certificates of deposit, debit cards, commercial lending, and consumer mortgages. Defendants offer deposits that are insured through the Federal Deposit Insurance Corporation.

54. The tying condition described herein is a prohibited tying condition under Title 12 U.S. Code, §1972(1) in that it required the customer to obtain some additional product or service from one of the affiliates of Chase and/or CAF.

55. The tying condition described herein is a prohibited tying condition under Title 12 U.S. Code, §1972(1) in that it required the customer to agree to refrain from purchasing gap insurance not specified on the Approved List.

56. The tying conditions described herein are not traditional bank services. Gap insurance is not a typical bank service and is not associated with deposits or investments, or other traditional banking services. The banking practice at issue was unusual in the banking industry.

57. The Defendants' acquisition of Credit Transactions from Kentucky dealers constitutes an extension of credit or a furnished service from a bank as to both Chase and CAF.

58. Defendants' conditions were not conditions that a similarly situated bank could reasonably impose to assure the soundness of the credit extended under the Credit Transactions.

59. The Tying Agreement was expressly and implicitly enforced through Defendants' control over the process whereby they purchased Credit Transactions.

60. All Defendants derived benefit and substantial revenue, directly or indirectly, from sales of CIA's gap insurance products. When Defendants' business segments join efforts to sell products and services to Chase's clients, the participating business segments agree to share revenue from those transactions.

61. As a proximate result of Defendants' actions described above, Midwest has suffered damages. Per 12 U.S. Code §1975, Midwest is permitted to recover three times its damages and costs, including attorney's fees, of pursuing this action.

## Count III
## Kentucky Revised Statute §304.9-135

62. Midwest incorporates every allegation in each of the preceding paragraphs as if fully rewritten.

63. Each Defendant is a "financial institution" within the meaning of Kentucky Revised Statute §304.9-135(1)(a).

64. Kentucky Revised Statute §304.9-135(3) prohibits any financial institution from directly or indirectly delaying or impeding the completion of a loan transaction or any other transaction with a financial institution for the purpose of influencing a consumer's selection or purchase of any insurance.

65. Defendants' conduct described herein violates Kentucky Revised Statute §304.9-135(3).

66. As a proximate result of Defendants' actions described above, Midwest has suffered damages described herein.

## Count IV

**Unfair and Deceptive Trade Practices**

67. Midwest incorporates every allegation in each of the preceding paragraphs as if fully rewritten.

68. Defendants Chase and CAF are engaged in the business inter alia of financing the purchase of personal property.

69. Defendant Chase and CAF are engaged in the business inter alia of lending money on the security of personal property.

70. The tying scheme described herein violated Kentucky Revised Statute § 304.12-140(1) by conditioning the performance of any act in connection with financing or lending, or the terms and conditions thereof, on the agreement of the purchaser, borrower, or his successors use a particular insurance product.

71. As a proximate result of Defendants' actions described above, Midwest has suffered damages as described herein.

**Count V**
**Unfair Competition under Kentucky Common Law**

72. Midwest incorporates every allegation in each of the preceding paragraphs as if fully rewritten.

73. In connection with their tying scheme described herein, Defendants told dealers and customers of Midwest that Midwest's gap insurance product was not on Defendants' Approved List.

74. Defendants' conduct injured Midwest by taking its business or impairing its good will.

75. Defendants acted with the intent to deceive the public and Midwest's customers into reaching the false conclusion that Midwest's product was inferior to gap insurance products that were on their Approved List.

76. Defendants' conduct resulted in actual deception of the dealers.

77. Defendants undertook this course of improper conduct for their own business gain.

78. As a proximate result of Defendants' actions described above, Midwest has suffered damages described herein.

## Count VI
## Tortious Interference With Business Relationship

79. Midwest incorporates every allegation in each of the preceding paragraphs as if fully rewritten.

80. Midwest has established business relationships with more than 300 automobile dealerships.

81. Defendants had actual and/or constructive knowledge of the business relationships between Midwest and the dealers.

82. Despite that knowledge, Defendants improperly and intentionally interfered with these business relationships with tying scheme described herein.

83. Defendants have no justification or privilege for this tortious conduct.

84. As a proximate result of Defendants' actions described above, Midwest has suffered damages described herein.

## Relief Requested

**WHEREFORE**, Midwest prays that the Court grant it the following relief:

A. Actual damages in excess of $250,000 to be trebled pursuant to 12 U.S. Code §1975, and 15 U.S. Code §15;

B. Plaintiff's costs and attorney's fees under 12 U.S. Code §1975, and 15 U.S. Code §15;

C. Punitive damages;

D. Prejudgment interest and Postjudgment interest; and

E. Such other relief as the Court may deem proper.

                                                  Respectfully submitted,

                                                  /s/ Scott R. Thomas
                                                  Scott R. Thomas (91644)
                                                  Matthew D. Hemmer (92984)
                                                  HEMMER PANGBURN DEFRANK PLLC
                                                  250 Grandview Drive, Suite 200
                                                  Fort Mitchell, Kentucky  41017
                                                  (859) 344-1188
                                                  (859) 578-3869(fax)
                                                  sthomas@HemmerLaw.com

                                                  Trial Attorneys for Plaintiff,
                                                  Midwest Agency Services, Inc.


**Jury Demand**

Plaintiff Midwest Agency Services, Inc. hereby requests a jury trial on all issues so triable.

                                                  /s/ Scott R. Thomas
                                                  Scott R. Thomas (0061040)
                                                  Matthew D. Hemmer (92984)
                                                  HEMMER PANGBURN DEFRANK PLLC
                                                  250 Grandview Drive, Suite 200
                                                  Fort Mitchell, Kentucky  41017
                                                  (859) 344-1188
                                                  (859) 578-3869(fax)
                                                  sthomas@HemmerLaw.com

                                                  Trial Attorneys for Plaintiff,
                                                  Midwest Agency Services, Inc.