UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| MIDWEST AGENCY SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  2: 09-165-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| JP MORGAN CHASE BANK, N.A., | ) | **MEMORANDUM OPINION** |
| et. al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is pending for consideration of the motion to dismiss filed by Defendants JP Morgan Chase Bank, N.A., Chase Auto Finance Corporation, and Chase Insurance Agency, Inc.  [Record No. 14] The Defendants assert that Plaintiff Midwest Agency Services, Inc.'s ("Midwest") Complaint does not contain sufficient facts to plausibly suggest that Plaintiff is entitled to relief.  [Record No. 14]  However, Midwest contends that its has alleged enough facts to permit a reasonable inference that it is entitled to relief.  [Record No. 19, p. 1]  After reviewing the relevant authorities, the Court agrees that the claim should be dismissed for failure to state a claim upon which relief can be granted.

**I.**

Defendant JP Morgan Chase Bank, N.A. ("Chase") is a wholly-owned subsidiary of JP Morgan Chase & Co. ("JP Morgan").  Chase is also one of the largest banking institutions

in the United States and one of the world's largest financial service firms. [Record No. 1, ¶ 7] Defendant Chase Auto Finance Corporation ("CAF") is a wholly-owned subsidiary of Chase. CAF purchases retail installment contracts from automobile dealers across the United States. [Record No. 1, ¶ 8] Defendant Chase Insurance Agency, Inc. ("CIA") is a wholly-owned subsidiary of JP Morgan Insurance Holdings, LLC, which is a wholly-owned subsidiary of JP Morgan. [Record No. 1, ¶ 9] Midwest sells different types of insurance, including gap insurance products. [Record No. 1, ¶ 18]

When purchasing a car, buyers typically have a number of financing options including funding the purchase through "indirect auto lending." [Record No. 1, ¶ 10] This occurs when a dealer sells the vehicle on credit to the buyer ("Credit Transaction"). [Record No. 1, ¶ 11] In this situation, the dealer is the creditor, and the buyer is the debtor. [Record No. 1, ¶ 11] However, dealers typically enter into these transactions with the expectation they will be able to transfer the rights and obligations under the Credit Transaction to another entity. [Record No. 1, ¶ 11] Chase is the largest institution that acquires Credit Transactions from automobile dealers. It usually acquires these Credit Transactions shortly after the original transaction is completed. [Record No. 1, ¶ 12] Chase acquires the Credit Transactions directly and indirectly through CAF, its agent and subsidiary. [Record No. 1, ¶ 12] Before purchasing Credit Transactions, Chase and CAF notify dealers of the terms on which they are willing to conduct the purchase. [Record No. 1, ¶ 13] Midwest alleges that because of their size and presence within the market, Chase and CAF do not negotiate with dealers over purchase terms. [Record No. 1, ¶ 13]

In any vehicle sale, dealers will generally offer to sell the buyer ancillary products and services, including gap insurance. [Record No. 1, ¶ 14] Gap insurance protects the car buyer from certain risks in the event of loss. [Record No. 1, ¶ 15] In the event that a car is "totaled," the buyer's primary insurance carrier will generally only pay the market value of the vehicle at the time of loss, which may be less than what the buyer owes under the Credit Transaction. [Record No. 1, ¶ 15] Gap insurance covers the difference between the market value and the amount owed under the Credit Transaction. [Record No. 1, ¶ 15]

Many gap insurance products are available in the Kentucky vehicle market, and vehicle buyers decide whether to purchase gap insurance. [Record No. 1, ¶ 16] If the buyer decides to purchase the insurance product, he or she will usually purchase whichever product is suggested by the dealer at the point of sale. [Record No. 1, ¶ 16] If the buyer purchases gap insurance, the purchase price is included in the total amount financed by the dealer, and in turn, sold to the entity purchasing the Credit Transaction. [Record No. 1, ¶ 17]

Both Midwest and CIA sell gap insurance products and compete against each other in this market. [Record No. 1, ¶ 19] Midwest sells a product called "Premier Gap." Its customers include more than 300 motor vehicle dealers in Kentucky, Ohio, Indiana, Tennessee, and West Virginia (collectively, the "Territory"). [Record No. 1, ¶ 18] CIA sells two gap insurance products, but does not dominate the gap insurance market, having less than a ten percent market share in the relevant Territory. [Record No. 1, ¶ 19] Midwest alleges that its gap insurance products are superior to those of CIA in every commercial respect. [Record No. 1, ¶ 22] Specifically, Midwest's gap insurance product is backed by

an insurance company with a superior rating to the insurance carrier backing CIA's gap insurance. [Record No. 1, ¶ 22]

On or after June 1, 2009, Chase and/or CAF announced an "internal policy change" regarding Credit Transactions they would be willing to acquire. [Record No. 1, ¶ 20] Specifically, CAF advised Kentucky dealers it would not purchase Credit Transactions that included gap insurance products unless the product was included on CAF's Approved List ("Approved List"). [Record No. 1, ¶ 21] Midwest's products were not included on this Approved List, but other vendors' products including CIA gap insurance products were listed. [Record No. 1, ¶ 21] Midwest alleges that the criteria used by the Defendants to determine which gap insurance products to include on the Approved List have nothing to do with the reliability of the product, strength of the company backing the product, or any other factor affecting any risk undertaken by Chase and/or CAF. [Record No. 1, ¶ 23] The company also asserts that the Defendants' Approved List is simply a way to funnel business to their affiliate, CIA. [Record No. 1, ¶ 24]

Midwest contends that the Approved List is a tool Chase and CAF use to coerce dealers into refraining from offering car buyers other gap insurance products, including Midwest's gap insurance products. [Record No. 1, ¶ 24] It further contends that Defendants have rejected Credit Transactions that contained Midwest gap insurance products, have returned the paperwork to the dealer, and have verbally suggested that the dealer substitute the CIA gap insurance product. [Record No. 1, ¶ 25] Once this substitution was made, Defendants then purchased the Credit Transaction from the dealer. [Record No. 1, ¶ 25]

Midwest's Complaint contains six claims. Count one contends that the Defendants violated §1 of the Sherman Act. Count two alleges that the Defendants violated the Bank Holding Company Act ("BHCA"). Counts three and four are brought pursuant to K.R.S. § 304.9-135 and K.R.S. § 304.12-140(1). Count five is based on a claim of unfair competition under Kentucky common law. Finally, count six asserts a claim of tortious interference with a business relationship.

## II.

Under Rule 12 of the Federal Rules of Civil Procedure, a court must construe the complaint in a light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *See Ley v. Visteon Corp.*, 540 F.3d 376, 380 (6th Cir. 2008); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). "Factual allegations contained in a complaint must raise a right to relief above the speculative level." *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). In other words, a plaintiff's arguments "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Heightened fact pleading of specifics is not required – only enough facts to state a claim to relief that is plausible on its face. *See Bassett*, 528 F.3d at 426. The Court may consider the complaint as well as "any exhibits attached thereto, public

records, [and] items appearing in the record of the case." *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (citation omitted).

## III.

### A. The Sherman Act

Midwest alleges the Defendants violated the Sherman Act through an unlawful tying arrangement, an unlawful reciprocal-dealing, and an unlawful exclusive-dealing arrangement. An a preliminary matter, to avoid dismissal, a plaintiff must have standing to assert this claim. And to have standing, a plaintiff must allege an antitrust injury. On the substantive claims, the complaint also fails to allege the necessary facts to establish a *prima facie* case that Defendants violated the Sherman Act by an unlawful tying arrangement, an unlawful reciprocal-dealing, or an unlawful exclusive-dealing arrangement.

#### 1. No Antitrust Injury

As noted above, to have standing to assert an antitrust violation, the plaintiff must allege an antitrust injury. *See Buyer's Corner Realty, Inc. v. N. Ky. Ass'n of Realtors*, 410 F. Supp. 2d 574, 579 (E.D. Ky. 2006). This element is so important that it is specifically required even when a plaintiff can demonstrate an unlawful tying arrangement. *Id.* The elements of an antitrust injury are: (1) the injury is the type of injury that antitrust laws were intended to prevent, and (2) the injury must flow from the characteristic which makes the defendant's acts unlawful. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also CTUnify, Inc. v. Nortel Networks, Inc.*, 115 F. App'x 831, 835-36 (6th Cir. 2004) (*citing Valley Prods. Co. v. Landmark, a Div. of Hospitality Franchise Sys., Inc.*, 128

F.3d 398, 402-03 (6th Cir.1997)) (noting that the Sixth Circuit has been "reasonably aggressive" in dismissing cases where the injury flows from conduct that is not an antitrust violation). Moreover, an inference of consumer injury is essential. *See* 2 Phillip E. Areeda, *Antitrust Law*, § 358d, at 467 (2000). In *Jefferson Parish*, the Supreme Court dismissed the plaintiff's complaint because it failed to show that consumers were worse off as a result of the arrangement. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984). If the market remains competitive, then an antitrust injury has not occurred. *See* Areeda, § 358d, at 467-68. Furthermore, a complaint alleging only that an individual competitor is injured, but not the market, does not establish an antitrust injury. *See B&H Med. v. ABP Admin.*, 526 F.3d 257, 265 (6th Cir. 2008); *Care Heating & Cooling, Inc. v. Am. Standard*, 427 F.3d 1008, 1014 (6th Cir. 2005).

Applying these principles in the present case, Midwest has failed to allege an antitrust injury. Midwest alleges only that it incurred damages as a result of Defendants' efforts "to unreasonably restrain competition in the gap insurance industry," [Record No. 1, ¶ 27] and that Plaintiff's injury is "a consequence of the diminished competition proximately caused by Defendants' scheme." [Record No. 1, ¶ 48] It has failed to allege an injury that is the type of injury that antitrust laws were intended to prevent. Midwest's allegation of an injury only to its ability to sell gap insurance products is not an antitrust injury. *Care Heating & Cooling, Inc.*, 427 F.3d at 1014. The law is settled that injury only to a competitor and not to the market does not create an antitrust injury because the purpose of antitrust laws is to protect competition, not competitors. *See Brunswick*, 429 U.S. at 488. Therefore, even if

Defendants' actions cause Midwest to lose business, this alleged injury alone is not an antitrust injury because no injury occurred either to the consumer or to competition as a whole. *See B&H Med.*, 526 F.3d at 265-66; *Care Heating & Cooling, Inc.*, 427 F.3d at 1014.

Although Midwest does allege that the Defendants' conduct decreased competition within the market, it does not allege facts that demonstrate that competition was actually diminished. Midwest has failed to state how many gap insurance providers exist and how many were listed on the Defendants' Approved List. Therefore, it is impossible to tell the extent to which competition may have been affected. *See Norte Car Corp. v. Firstbank*, 25 F. Supp. 2d 9, 21 (D. P.R. 1998) (noting that alleging that competition was reduced, without citing specific facts demonstrating this decrease would not carry the pleading burden). Rather, Midwest only alleges facts that demonstrate that it was removed from competition in the market – not that competition within the entire market was diminished. Therefore, it fails to allege an injury that is of the type that antitrust laws were intended to prevent because the facts do not demonstrate that competition was harmed, as required to establish an antitrust injury.

Midwest also fails to allege an injury that flows from that which makes the Defendants' acts unlawful. It alleges that the Defendants were engaged in an unlawful tying arrangement. However, Midwest's alleged injury flows from its exclusion from the Approved List, not from the alleged tying arrangement itself. Use of an approved list by a buyer of a product is not an antitrust violation and does not cause an antitrust injury. *See CTUnify, Inc.*, 115 F. App'x at 836 (noting that the plaintiff's injuries flowed from its

-8-

exclusion from a preferred vendor list, not an alleged tying agreement). Further, Section 1 of the Sherman Act does not restrict a buyer's freedom to select the entity from whom it will purchase products. *See Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 347 (6th Cir. 2006). Rather, such selections are the nature of the marketplace. *Id*. Therefore, the Defendants' actions were not unlawful but were part of the normal environment of business and competition. As a result, Midwest has failed to allege facts that demonstrate an antitrust injury. Such failure if fatal to its first claim for relief.

### 2. The Tying Arrangement Claim

The Defendants also contend that Midwest has failed to establish a *prima facie* case that it created an unlawful tying arrangement and that this failure constitutes an alternative ground for dismissing this claim. The relevant part of Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. This section has been interpreted to restrict only "unreasonable" restraints of trade, and thus is the section used as the basis for a tying arrangement claim. *See Buyer's Corner Realty*, 410 F. Supp. 2d at 578. A tying arrangement is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak v. Image Technical Servs., Inc.*, 504 U.S. 451, 461 (1992). A tying arrangement violates antitrust law only if a "substantial volume of commerce is foreclosed thereby." *Jefferson Parish*, 466 U.S. at 16.

Accordingly, a plaintiff must allege that a tying arrangement exists and must demonstrate that the arrangement is unlawful. The elements required to demonstrate an unlawful tying arrangement claim are: (1) the seller has "appreciable economic power" in the tying product market; (2) the tying arrangement "affects a substantial volume of commerce in the tied market"; (3) "the seller has a direct economic interest in the sale of the tied product"; and (4) the plaintiff has suffered an antitrust injury resulting from the tying arrangement. *See Buyer's Corner Realty, Inc.*, 410 F. Supp. 2d at 578 (*citing CTUnify*, 115 F. App'x at 834). In the present case, Midwest has failed to demonstrate that a tying arrangement exists.

Midwest alleges that the Defendants condition their purchase of Credit Transactions on the dealers' use of gap insurance products from an Approved List. Accordingly, it alleges that the tying product is the service of purchasing of the Credit Transactions, and the tied product is the gap insurance product. However, this alleged arrangement fails to satisfy the definition of a tying arrangement. First, the Defendants are the purchasers of the Credit Transactions. They are not selling a product in this situation and, therefore, do not have the requisite selling power to coerce buyers to accept a tied product as required in a tying arrangement. *See Jefferson Parish*, 466 U.S. at 13 (noting that the "essential characteristic" of an unlawful tying arrangement is the seller's "exploitation of control" to force the buyer to purchase the tied product). This situation, in which a buyer uses his power to induce a supplier to buy his product, is arguably reciprocity, not a tying arrangement. *See* Areeda, § 17G, at 448. Defendants have created certain standards for Credit Transactions they would

be willing to buy, which is not an antitrust violation. *See Expert Masonry, Inc.*, 440 F.3d at 347 (noting that a buyer can decide with whom they do business without running afoul of the Sherman Act). Midwest has cited no authority which applies a tying arrangement to a situation in which a buyer is the one allegedly tying products.

Second, even if the court accepts Midwest's argument that the Defendants are supplying a service, they do not require the purchase of any gap insurance product and, therefore, there is no coercion. Midwest admits that car buyers may or may not choose to purchase gap insurance. [Record No. 1, p. 16] The Defendants do not require the Credit Transactions they purchase to include gap insurance. Thus, by definition, a tie cannot exist because a "tied product" is not being forced on the buyer. However, if a car buyer purchases gap insurance products and the car dealer intends to sell the Credit Transaction to Defendants, the gap insurance product must be from a vendor on the Approved List. Further, the Approved List includes several vendors, only one of which is CIA. This is an example of a buyer creating terms on which it is willing to do business. Therefore, Midwest has failed to allege an unlawful tying arrangement in violation of the Sherman Act.

### 3. Reciprocal and Exclusive Dealing Claims

Midwest also alleges that the Defendants' arrangement constitutes both an unlawful reciprocal-dealing and an unlawful exclusive-dealing arrangement. A reciprocal-dealing arrangement exists when one party agrees to buy a second party's goods, provided that the second party buys a particular product from the first party. *See* Areeda, § 1775a, at 448-49. Reciprocal-dealing arrangements are only unlawful when one party employs its market

power to "coerce" the second party to buy the first party's product. *Id*. at 449. An exclusive-dealing arrangement exists when one buyer agrees to purchase a product from only one supplier for a specific amount of time. *See Norte Car Corp.*, 25 F. Supp. 2d at 17.

In this case, Midwest does not establish that either a reciprocal-dealing arrangement or an exclusive-dealing arrangement exists because the Defendants did not require the purchase of CIA gap insurance products. The Defendants agreed to purchase Credit Transactions that either: (1) did not include a gap insurance product, or (2) if it did, the gap insurance product must have been purchased from a vendor on the Approved List. Although CIA was on the Approved List, it was not the only vendor listed. Because the Defendants did not condition their purchase of Credit Transactions on the purchase of CIA gap insurance product, a reciprocal-dealing arrangement did not exist. Similarly, because the Defendants purchased Credit Transactions that included gap insurance products from any vendor on the Approved List, not just those that included CIA gap insurance products, an exclusive dealing agreement did not exist.

The Court also notes that even if it were to find that an exclusive-dealing agreement exists, it would not be unlawful. An exclusive-dealing arrangement is unlawful when "the competition foreclosed by the contract [is] found to constitute a substantial share of the relevant market." *Tampa Elect. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961). As a matter of law, courts have concluded that foreclosure levels of less than 30 or 40 percent are not a substantial share. *See B&H Med.*, 526 F.3d at 266. Plaintiff alleges in its complaint only that "the tie foreclosed a substantial amount of commerce in the market for the tied

-12-

product." [Record No. 1, ¶ 42] However, this assertion includes no percentages or other evidence supporting this statement. As such, it constitutes a conclusory statement of law which does not carry the pleading burden. *See Twombly*, 550 U.S. at 555.

In summary, Midwest's first claim fails for two separate reasons: (1) it fails to allege an antitrust injury and (2) it fails to allege the necessary facts to establish a *prima facie* case that Defendants violated the Sherman Act by an unlawful tying arrangement, an unlawful reciprocal-dealing, or an unlawful exclusive-dealing arrangement.

**B.    The Bank Holding Company Act ("BHCA")**

Midwest alleges in the second count of its Complaint that the Defendants violated the BHCA by establishing an unlawful tying arrangement. The BHCA provides, in relevant part, that:

> (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement–
>
> (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;
>
> (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company; . . .
>
> (E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

12 U.S.C. § 1972(1) (2010).  The elements of an unlawful tying arrangement under the BHCA are: (1) the bank imposed an anti-competitive tying arrangement by conditioning an extension of credit upon borrower's obtaining additional credit or services from the bank; (2) the arrangement was unusual or nontraditional in the banking industry; and (3) the practice benefitted the bank.  *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 565 (6th Cir. 2003).

Midwest is unable to establish the first of these elements because the Defendants did not extend any credit or provide a service.  The Defendants purchased Credit Transactions that had already been completed between the car dealer and the car buyer.  Accordingly, the Defendants' purchase of the Credit Transaction from the car dealers does not constitute an extension of credit or provision of a banking service to satisfy the first element of a BHCA claim.  In addition, as discussed above, Midwest cannot demonstrate that a tying arrangement existed.  While the standard for a tying arrangement under a BHCA claim does not require coercion, the statutory language prohibits the "extension of credit" based on a "condition or requirement" of additional actions.  *See* 12 U.S.C. § 1972(1) (2010).  Accordingly, Midwest must establish that the Defendants required car dealers to purchase certain gap insurance products in order for the Defendants to purchase the Credit Transactions.  *See Highland Capital, Inc.*, 350 F.3d 567-68 (noting that demonstrating that borrowers purchased additional products because it pleased the lender did not establish that the purchase was a requirement for purposes of establishing a claim).

Even assuming that the purchase of the Credit Transaction constitutes an extension of credit for the purposes of the BHCA claim, the Defendants did not require car dealers to include any gap insurance products in the Credit Transactions they purchased. Rather, the Defendants required that if a gap insurance product was included in the Credit Transaction, it must be from a vendor on the Approved List. Because the Defendants would purchase Credit Transactions without a gap insurance product, the purchase was not conditioned on the inclusion of CIA gap insurance products.

### C. K.R.S. § 304.9-135

The Defendants argue that Midwest's claim based on K.R.S. § 304.9-135 should be dismissed because the insurance statute does not apply to the facts alleged. The statute states: "An officer or employee of a financial institution shall not directly or indirectly delay or impede the completion of a loan transaction or any other transaction with a financial institution for the purpose of influencing a consumer's selection or purchase of any insurance." K.R.S. § 304.9-135(3) (2010). In its Complaint, Midwest asserts that the Defendants' conduct violates this statute but it fails to allege specific facts concerning what conduct violated the statute.

The Defendants' alleged actions, taken as true, do not violate the statutory language. The Defendants were not involved with a loan transaction. Instead, they purchased Credit Transactions after the loan was completed. Additionally, the Defendants did not require the purchase of any gap insurance products, as demonstrated by the fact that they purchased Credit Transactions that did not include gap insurance products. Because the loan was

completed before the Defendants purchased the Credit Transactions, the Defendants could not delay or impede the completion of such transaction. Accordingly, Midwest cannot establish a violation of K.R.S. § 304.9-135.

### D. Counts Four and Five

Midwest alleges in count four that the Defendants violated K.R.S. § 304.12-140(1). [Record No. 1, p. 15] This statute restricts coercion in requiring insurance. It states:

> (1) No person engaged in the business of financing the purchase of real or personal property or of lending money on the security of real or personal property shall require, as a condition to financing or lending, or varying the terms and conditions of the financing or lending, or as a condition to the renewal or extension of any loan or credit or to the performance of any other act in connection with financing or lending, that the purchaser or borrower, or his successors, shall negotiate through a particular insurer, agent, or type of insurer, any policy of insurance or renewal insuring the property or the life or health of the borrower.
>
> (2) This section shall not prevent the reasonable exercise by any vendor or lender of its right to approve or disapprove the insurer selected to underwrite the insurance, and to determine the adequacy of the insurance offered.

K.R.S. § 304.9-135 (2010). Count five alleges that the Defendants committed unfair competition under Kentucky common law. Both of these counts are premised on the alleged tying arrangement claim which, as discussed above, is legally insufficient. Midwest did not allege any additional facts to support these counts.

In addition, K.R.S. § 304.12-140(1) prohibits the conditioning of lending or financing on the purchase of a particular insurance product. And as discussed above, the Defendants did not lend or finance the purchase of the car. Instead, they purchase Credit Transaction after the lending occurs. Also, count four alleges that the Defendants' conduct injured

-16-

Midwest by "taking its business or impairing its good will." [Record No. 1, ¶ 74]. However, Midwest fails to allege any facts that demonstrated that it lost business or that the Defendants' creation and/or use of the Approved List impaired its goodwill. Accordingly, these counts will also be dismissed.

### E. Tortious Interference With a Business Relationship

The Defendants assert that Midwest's claim of tortious interference with business relationships also should be dismissed. To state a claim for tortious interference, a plaintiff must allege facts that the interference occurred through "unlawful means, such as fraud, deceit or coercion." *Henkin v. Berea Bank & Trust Co.*, 566 S.W.2d 420, 425 (Ky. Ct. App. 1978); *see also AMC v. Cincinnati Milacron, Inc.*, No. 3:97-CV-343-H, 2000 WL 33975582, at *7 (W.D. Ky. Jan. 25, 2000) (noting that "impropriety should not be confused with aggressive, competitive business practices). Midwest's Complaint alleges that the Defendants "improperly and intentionally interfered" with existing business relationship, but the basis that Midwest cites for the impropriety is the alleged tying arrangement scheme. Again, because an unlawful tying cannot be established under the facts presented, Midwest cannot prove that any alleged interference was the result of unlawful means.

### IV.

Midwest correctly notes that the appropriate standard for dismissal is that the complaint contains enough information to permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S. Ct. at 1937, 1940. Here, however, Midwest's Complaint fails to allege an antitrust injury and fails to allege the

-17-

necessary facts to establish a *prima facie* case that the Defendants violated the Sherman Act by an unlawful tying arrangement, an unlawful reciprocal-dealing, or an unlawful exclusive-dealing arrangement. In addition, Midwest's Complaint does not allege facts necessary to establish an unlawful tying arrangement. Finally, even if the Defendants' actions are taken as true, they would not violate K.R.S § 304.9-135. Accordingly, it is hereby **ORDERED** as follows:

1. Defendants JP Morgan Chase Bank, N.A., Chase Auto Finance Corporation, and Chase Insurance Agency, Inc.'s motion to dismiss [Record No. 14] is **GRANTED**.

2. All claims asserted in this action by Plaintiff Midwest Agency Services, Inc. are **DISMISSED**, with prejudice.

3. This case is **DISMISSED** and **STRICKEN** from the Court's docket.

4. A final, appealable Judgment will be entered this date.

This 11th day of March, 2010.

Signed By:
*Danny C. Reeves* DCR
United States District Judge